## STATE OF CONNECTICUT *v.* VICTOR CUBANO
## (12889)

PETERS, C. J., HEALEY, DANNEHY, SANTANIELLO and CALLAHAN, Js.

Argued January 13—decision released April 7, 1987

*Joseph G. Bruckmann,* assistant public defender, with whom, on the brief, was *Joette Katz,* public defender, for the appellant (defendant).

*Dennis J. O'Connor,* assistant state's attorney, with whom, on the brief, was *John M. Bailey,* state's attorney, for the appellee (state).

ARTHUR H. HEALEY, J. The defendant, Victor Cubano, was charged by substitute information with the crimes of robbery in the first degree in violation

of General Statutes § 53a-134 (a) (4),[1] and of being a persistent dangerous felony offender in violation of General Statutes § 53a-40 (a).[2] On October 23, 1985, the jury found the defendant guilty of the charge of robbery in the first degree. On October 28, 1985, after a separate trial, the same jury found the defendant guilty of being a persistent dangerous felony offender. The court sentenced the defendant to a term of

[1] General Statutes § 53a-134 (a) provides: "ROBBERY IN THE FIRST DEGREE: CLASS B FELONY. (a) A person is guilty of robbery in the first degree when, in the course of the commission of the crime or immediate flight therefrom, he or another participant in the crime: (1) Causes serious physical injury to any person who is not a participant in the crime; (2) is armed with a deadly weapon; or (3) uses or threatens the use of a dangerous instrument; or (4) displays or threatens the use of what he represents by his words or conduct to be a pistol, revolver, rifle, shotgun, machine gun or other firearm, except that in any prosecution under this subdivision, it is an affirmative defense that such pistol, revolver, rifle, shotgun, machine gun or other firearm was not a weapon from which a shot could be discharged. Nothing contained in this subdivision shall constitute a defense to a prosecution for, or preclude a conviction of, robbery in the second degree, robbery in the third degree or any other crime."

[2] General Statutes § 53a-40 (a) provides: "PERSISTENT OFFENDERS: DEFINITIONS; DEFENSE; AUTHORIZED SENTENCES. (a) A persistent dangerous felony offender is a person who (1) stands convicted of manslaughter, arson, kidnapping, sexual assault in the first or third degree, sexual assault in the first or third degree with a firearm, robbery in the first or second degree, or assault in the first degree; and (2) has been, prior to the commission of the present crime, convicted of and imprisoned, under a sentence to a term of imprisonment of more than one year or of death, in this state or in any other state or in a federal correctional institution for any of the following crimes: (A) The crimes enumerated in subdivision (1), the crime of murder, or an attempt to commit any of said crimes or murder; or (B) prior to October 1, 1975, any of the crimes enumerated in section 53a-72, 53a-75 or 53a-78 of the general statutes, revision of 1958, revised to 1975, or prior to October 1, 1971, in this state, assault with intent to kill under section 54-117, or any of the crimes enumerated in sections 53-9, 53-10, 53-11, 53-12 to 53-16, inclusive, 53-19, 53-21, 53-69, 53-78 to 53-80, inclusive, 53-82, 53-83, 53-86, 53-238 and 53-239 of the general statutes, revision of 1958, revised to 1968, or any predecessor statutes in this state, or an attempt to commit any of said crimes; or (C) in any other state, any crimes the essential elements of which are substantially the same as any of the crimes enumerated in subdivision (1) or (2)."

imprisonment of twenty years. The defendant appealed, claiming that the trial court's denial of his motions for a mistrial and for a new trial deprived him of his right to a fair trial by an impartial jury under the sixth and fourteenth amendments to the United States constitution and article first, § 8, of the Connecticut constitution. The defendant also claims that the trial court erred in denying his motion to suppress the out-of-court and in-court identifications of the defendant made by Peter DiNello.

The jury could reasonably have found the following background facts: On May 3, 1984, DiNello was employed by the Kwik Stop store in Southington, working the 4 p.m. to midnight shift. At approximately 10:15 p.m., DiNello, who was working alone at the time, was seated behind the counter when a man with a nylon stocking over his face entered the store and pointed a "bluish" colored revolver at him. The man, later identified as the defendant, directed DiNello to put money into a paper bag he was holding. DiNello complied with the request. The man directed DiNello to "lay face first on the floor" and then left the store. After a few minutes, DiNello got off the floor and telephoned the police. Approximately three or four minutes had elapsed from the time the man came into the store until the time that DiNello called the police.

On May 6, 1984, three days after the robbery, Newington police detective Robert Seiler stopped a car which was occupied by the defendant and another male. On the floor of the car was a Smith and Wesson snub nose revolver with a two-inch barrel. The revolver was "dark blue" in color. On that same day, a state's witness, Gregory Capobianco, saw the defendant with a brown nylon stocking mask in his possession. The gun and the mask seen in the defendant's possession on May 6, 1984, were similar to those used by the robber on May 3, 1984.

# I

The defendant's first claim of error is that the trial court's denial of his motions for a mistrial and for a new trial deprived him of his right to a fair trial by an impartial jury under the sixth and fourteenth amendments to the United States constitution and article first, § 8, of the Connecticut constitution.[3]

Following summations by both counsel and before the court had given the jury instructions, one of the members of the jury requested a meeting with the trial judge. During this meeting in chambers, both counsel and the court reporter were present. At the meeting, the juror indicated that she had, on that day, noticed Domingo Astirazan, a friend of hers, in the courtroom. She related that Astirazan's family and her family were very close, that she and Astirazan worked together but not in the same building, and that he was a person whom she knew "very well." She stated that she had concluded from her observations of Astirazan in the courtroom that he was a friend of the defendant and that she was "shocked" at that thought.[4] In reference

---

[3] Although the defendant makes his claim under both the federal and state constitutions, we need not discuss the issue under our state constitution because the defendant " ' "has proffered no argument that the rights afforded to him by the federal and state constitutions are in any way distinguishable with respect to the substantive issue that he has raised. . . ." ' " *State* v. *Chung,* 202 Conn. 39, 45 n.7, 519 A.2d 1175 (1987), quoting *State* v. *Toste,* 198 Conn. 573, 576 n.3, 504 A.2d 1036 (1986).

[4] The colloquy discloses, inter alia, the following statements:

"[The Juror]: This morning, you know, I was listening attentively to the two lawyers. And all of a sudden I saw a person inside the courtroom that I know him very well. And I believe that he was—must be a friend of the defendant. So I just wanted to—

"The Court: You don't know that for sure.

"[The Juror]: I can say yes.

"The Court: Did you know he is a friend of the defendant?

"[The Juror]: I believe so, sir.

"The Court: And you know him very well?

to Astirazan, the juror stated: "I am a little bit confused at this point because, I mean, in my sense, if that person—I cannot associate this person that I'm talking—I cannot associate this person to not a good person." When asked by the court if she could decide the case fairly despite her friend's apparent acquaintance with the defendant, the juror stated that she could do so.[5] The court instructed the juror to refrain from discussing the matter with the other jurors and excused her from chambers.

"[The Juror]: Very well. His family and my family are very close.

"The Court: He is a friend of the defendant?

"[The Juror]: He, yes. He must be on the side of the defendant.

"The Court: Huh?

"[The Juror]: He must be on the side of the defendant.

"Mr. Hunt: Would it be permissible to inquire who she recognized in the courtroom?

"The Court: Who did you recognize?

"[The Juror]: The name of the person?

"The Court: Yes.

"[The Juror]: Domingo Astirazan.

"The Court: All right. Let me ask you this question. Assuming what you tell me is true, do you think that would in any way influence your decision in this case?

"[The Juror]: I am a little bit confused at this point because, I mean, in my sense, if that person—I cannot associate this person that I'm talking—I cannot associate this person to not a good person.

"The Court: What?

"[The Juror]: Let me rephrase this. I cannot see this person being friends of a person that might be—that is very hard for me to answer, your Honor.

"The Court: Are you trying to say you cannot associate this person who is your friend with knowing a person who is alleged to have committed a crime?

"[The Juror]: Right.

"The Court: Well, would you—on that fact alone would you be—would you feel that you would not be able to be an impartial juror?

"[The Juror]: I am a little bit confused at this point because I was really shocked when I saw that person inside the courtroom this morning. I was—I mean, I was—my God—of all these people—"

[5] The colloquy discloses the following statements:

"The Court: Assuming for the moment that you are correct that this person you saw in the courtroom is a friend of the defendant. Would that fact influence you in your decision in this case for or against the defendant?

After the juror had left chambers, defense counsel indicated that he felt that the juror had already formed an adverse opinion of the defendant. After consultation with his client, defense counsel, in the absence of the jury, moved for a mistrial, claiming that the juror had "already arrived at a fixed opinion as to the guilt of my client."[6] The court denied the motion, finding that the juror had not made up her mind as to the guilt or innocence of the defendant and that even if she had, she had stated that her friend's acquaintance with the defendant "would in no way affect her deliberations in this case for or against the defendant . . . ." Defense counsel took an exception. On October 28,

"[The Juror]: It shouldn't.

"The Court: It would not influence you in any way?

"[The Juror]: It shouldn't.

"The Court: In other words, if you are shocked at this person being a friend—being a friend of the defendant, you would be shocked at your friend being a friend of the defendant, not that—

"[The Juror]: Exactly.

"The Court: Okay. So, in other words, so you are telling both counsel and the Court that assuming you are correct that your friend that you saw in the courtroom is a friend of the defendant in this case, that that would in no way influence your decision of guilt or innocence based on that knowledge?

"[The Juror]: Right.

"The Court: That you would decide this case irrespective of the fact that you think your friend in the courtroom may be a friend of the defendant?

"[The Juror]: Yes, sir.

"The Court: Okay. Thank you. You can go back to the jury. One other question. Sit down a minute. Have you told any of the other jurors about this?

"[The Juror]: No, sir.

"The Court: Okay. Don't tell any of the other jurors.

"[The Juror]: I won't.

"The Court: You will not tell any of this at any time during the deliberations.

"[The Juror]: No, sir.

"The Court: Thank you.

"[The Juror]: Thank you."

[6] At the time that the juror requested the meeting in chambers, the two alternates originally selected had already replaced jurors who could not serve through the end of the case.

1985, the court denied the defendant's motion for a new trial which alleged, inter alia, that the defendant had been denied a fair and impartial jury. The defendant claims that the denial of these motions constitutes reversible error. We disagree.

The defendant argues that from the moment the juror saw her friend in the courtroom during summation, she formed an adverse opinion about the defendant and that the juror's "repeated" expressions of the "shock" she had experienced, upon realizing that the two men were acquainted, clearly indicated her adverse feelings about the defendant. The defendant also contends that any instruction relating to the premature formation of an opinion would be futile given "this particular juror's obvious inability to abide by the court's twice given admonition not to think about the merits of the case until after the court instructed the jury on the law . . . ."[7] The defendant argues, therefore, that although his motion for a mistrial had been made after the substantial investment of valuable resources in a trial that was near conclusion, " ' "the right to an impartial jury . . . dominated all other considerations" ' " and thus the court erred in failing to declare a mistrial.[8]

---

[7] On the first day evidence was presented, the court instructed the jury as follows: "[T]his is most important, that you are not to discuss this case at any time during the course of the trial among yourselves or with anybody else, nor allow anybody else to talk to you about it. The only time you will think about this case insofar as deciding the case is when the six of you that are going to deliberate are in the jury room after you have heard the instructions of law that I will give you." Four days later, after all the evidence had been presented, the court instructed the jury: "So please don't think about the case, even though you have heard all the evidence. Don't give it any thought until you hear the law that I give to you which applies to this case. And after you have heard the law then you will deliberate in the jury room."

[8] Initially, the state argues that this court cannot overturn the jury's verdict and grant a new trial in this case because of the "firmly established" rule that evidence of juror misconduct or mistake cannot be received from

" '[T]he right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, "indifferent" jurors.' *Irvin* v. *Dowd,* 366 U.S. 717, 722, 81 S. Ct. 1639, 6 L. Ed. 2d 751 (1961)." *State* v. *Ziel,* 197 Conn. 60, 64, 495 A.2d 1050 (1985);[9] see *Murphy* v. *Florida,* 421 U.S. 794, 799, 95 S. Ct. 2031, 44 L. Ed. 2d 589 (1975); *State* v. *Brigandi,* 186 Conn. 521, 542, 442 A.2d 927 (1982). " 'Impartiality is not a technical conception. It is a state of mind. For the ascertainment of this mental attitude of appropriate indifference, the [c]onstitution lays down no particular tests and procedure is not chained to any ancient and artificial formula.' " *Irvin* v. *Dowd,* supra, 724–25, quoting *United States* v. *Wood,* 299 U.S. 123, 145–46, 57 S. Ct. 177, 81 L. Ed. 78 (1936). The trial court is vested with wide discretion in determining the competency of jurors to serve, and that judgment will not

---

a juror to vitiate the verdict. See Practice Book § 871. We disagree for two reasons. First, the state has treated the defendant's motion for a mistrial as an attempt to impeach the jury's verdict. This characterization of the defendant's claim is inappropriate because at the time the defendant moved for a mistrial, there did not exist a verdict per se, which is the subject of this appeal. Second, although Practice Book § 871 prohibits receiving evidence concerning the mental processes by which a verdict was determined, the rule does allow evidence of juror misconduct. " 'The question is whether the misconduct is of such a nature that it probably rendered the juror unfair or partial.' " *State* v. *Castonguay,* 194 Conn. 416, 437, 481 A.2d 56 (1984). Therefore, it would be proper to inquire whether the juror had reached a fixed opinion on the evidence; however, "[a]ny inquiry into the content of the opinion or the impact it had on the juror is clearly impermissible. *Aillon* v. *State,* [168 Conn. 541, 551–52, 363 A.2d 49 (1975)]." *State* v. *Castonguay,* supra.

[9] The sixth amendment to the United States constitution provides in part: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed. . . ." This guaranty has been made applicable to the states by incorporation into the fourteenth amendment. See *Duncan* v. *Louisiana,* 391 U.S. 145, 88 S. Ct. 1444, 20 L. Ed. 2d 491, reh. denied, 392 U.S. 947, 88 S. Ct. 2270, 20 L. Ed. 2d 1412 (1968).

The constitution of Connecticut, article first, § 8, provides in pertinent part: "In all criminal prosecutions, the accused shall have a right . . . to a speedy, public trial by an impartial jury."

be disturbed absent a showing of an abuse of discretion. *United States* v. *Tegzes,* 715 F.2d 505, 509 (11th Cir. 1983); *United States* v. *Carlin,* 698 F.2d 1133, 1135 (11th Cir.), reh. denied, 705 F.2d 471, cert. denied, 461 U.S. 958, 103 S. Ct. 2431, 77 L. Ed. 2d 1317 (1983); *United States* v. *Sears,* 663 F.2d 896, 900 (9th Cir. 1981), cert. denied sub nom. *Werner* v. *United States,* 455 U.S. 1027, 102 S. Ct. 1731, 72 L. Ed. 2d 148 (1982); *State* v. *Ziel,* supra. In exercising this discretion the trial court must zealously protect the rights of the accused. *Wainwright* v. *Witt,* 469 U.S. 412, 429–30, 105 S. Ct. 844, 83 L. Ed. 2d 841 (1985).

This court has recognized that a defendant may lose the benefit of his right to a fair and impartial jury where the jury has been instructed that it may discuss the case prior to the time the case is submitted to it for deliberation. *State* v. *Castonguay,* 194 Conn. 416, 433, 481 A.2d 56 (1984); *State* v. *Washington,* 182 Conn. 419, 424–25, 438 A.2d 1144 (1980). Similarly, this court has held that where a potential juror has such a fixed and settled opinion in a case that he cannot judge impartially the guilt of the defendant, he should not be selected to sit on the panel. *State* v. *Ziel,* supra, 66; *State* v. *Potter,* 18 Conn. 166, 174–75 (1846); see also *Patton* v. *Yount,* 467 U.S. 1025, 104 S. Ct. 2885, 81 L. Ed. 2d 847 (1984). This court has also stated that " '[t]o succeed on a claim of bias the defendant must raise his contention of bias from the realm of speculation to the realm of fact.' *State* v. *Almeda,* 189 Conn. 303, 313, 455 A.2d 1326 (1983); *State* v. *Bowen,* 167 Conn. 526, 532, 356 A.2d 162 (1975)." *State* v. *Ziel,* supra, 65; see also *Dennis* v. *United States,* 339 U.S. 162, 168, 70 S. Ct. 519, 94 L. Ed. 734, reh. denied, 339 U.S. 950, 70 S. Ct. 799, 94 L. Ed. 1364 (1950). With these principles in mind, we address the merits of the defendant's claim.

In challenging the competency of the juror to remain on the panel it was the defendant's burden to prove actual bias on behalf of the juror. See *State* v. *Ziel,* supra; *State* v. *Bowen,* supra, 532. While the juror was in chambers, the court inquired whether the relationship between her friend and the defendant would affect her decision on guilt or innocence. The juror stated that it would not and that she could decide the case impartially irrespective of the fact that her friend was an acquaintance of the defendant. After the juror had been excused from chambers, defense counsel argued that the "shock" she had expressed was a result of the fact that the juror had already formed an adverse opinion as to the innocence of the defendant. At this time, however, defense counsel admitted that the opinion was "somewhat oblique" and "not clearly stated." The court asked defense counsel whether he wanted the court to call the juror back to "satisfy you as to whether or not she has formed any pre-opinion at this time . . . as to the innocence or guilt of the accused." Rather than take advantage of this opportunity to question the juror as to the nature and effect of her alleged "opinion," defense counsel left chambers to confer with the defendant and he did not return. When court reconvened, defense counsel moved for a mistrial without seeking any further inquiry of the juror. The court denied the motion, specifically finding that the juror had not "indicated that she [had] made up her mind by anything that she said in chambers." The court also noted that the juror had stated that the fact that her friend might be "acquainted with the defendant would in no way affect her deliberation in this case for or against the defendant . . . ." Given the "oblique" nature of the juror's statement, the failure of defense counsel to examine the juror to establish bias or premature formation of an opinion, which is his burden, and the court's finding that the juror had not "indicated

that she [had] made up her mind by anything she said in chambers," we conclude that the defendant has failed to "raise his contention of bias from the realm of speculation to the realm of fact." The denial of the motions for mistrial and for a new trial was within the reasonable exercise of the trial court's discretion. See *State* v. *Almeda,* supra; *State* v. *McCall,* 187 Conn. 73, 77, 444 A.2d 896 (1982).

Even if we assume, arguendo, that the defendant had established that the juror's statements amounted to an expression of a premature opinion of the defendant's guilt, that by itself would not be enough to establish error in the court's denial of his motion for a mistrial. Not every incident of juror misconduct requires a new trial. See, e.g., *United States* v. *Klee,* 494 F.2d 394, 396 (9th Cir.), cert. denied, 419 U.S. 835, 95 S. Ct. 62, 42 L. Ed. 2d 61 (1974), and cases there cited; *State* v. *Asherman,* 193 Conn. 695, 736, 478 A.2d 227 (1984), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985). The test for a new trial is " 'whether or not the misconduct has prejudiced the defendant to the extent that he has not received a fair trial.' " *State* v. *McCall,* supra, quoting *United States* v. *Klee,* supra; see also *United States* v. *Hendrix,* 549 F.2d 1225 (9th Cir.), cert. denied, 434 U.S. 818, 98 S. Ct. 58, 54 L. Ed. 2d 74, reh. denied, 434 U.S. 960, 98 S. Ct. 493, 54 L. Ed. 2d 321 (1977). In *State* v. *McCall,* supra, 81, we said: "Mere expression of opinion, as opposed to positive expression of facts, does not warrant a mistrial." Even where a juror has formed some preconceived opinion as to the guilt of an accused, a juror is sufficiently impartial if he or she can set aside that opinion and render a verdict based on evidence in the case. *United States* v. *Moon,* 718 F.2d 1210, 1218–19 (2d Cir. 1983), cert. denied, 466 U.S. 971, 104 S. Ct. 2344, 80 L. Ed. 2d 818 (1984). "Only where a juror has indicated a refusal to consider testimony and displayed evidence

of a closed mind concerning [the] defendant's innocence can it be said that [the court] abused its discretion in refusing to [remove] a juror [from the panel]." *United States* v. *Smith,* 748 F.2d 1091, 1092 (6th Cir. 1984). It is enough if a juror is able to set aside any preconceived notions and decide the case on the evidence presented and the instructions given by the court. *Patton* v. *Yount,* supra; *State* v. *Zeil,* supra; see also *Irvin* v. *Dowd,* supra, 723. While we recognize that a juror's assurances that he or she is equal to the task are not dispositive of the rights of an accused; *Murphy* v. *Florida,* supra, 800; we are aware of the broad discretion of a trial judge which includes his determination of the credibility to be given a juror's statement in this context. *United States* v. *Thompson,* 744 F.2d 1065, 1068 (4th Cir. 1984); *State* v. *Ziel,* supra, 65; *State* v. *Bowen,* supra, 533; see *Rosales-Lopez* v. *United States,* 451 U.S. 182, 188–89, 101 S. Ct. 1629, 68 L. Ed. 2d 22 (1980).

Our review of the transcript of the in camera and in-court colloquy between the trial judge, the juror and counsel leads us to conclude that the defendant has failed to establish that the alleged "juror misconduct" violated his constitutional right to a fair trial before an impartial jury. Even if we assume that the statements made by the juror amounted to an expression of a premature opinion of guilt, the record does not support a finding that the opinion was irrevocable and could not be set aside. To the contrary, the record does support the trial court's finding that the juror's friend's acquaintance with the "defendant would in no way affect her deliberation in this case for or against the defendant . . . ." When asked whether her decision as to the guilt or innocence of the defendant would be influenced, she said that it would not and that she could "decide this case irrespective of the fact that [she thought her] friend . . . may be a friend of the defend-

ant." Moreover, the determination of the trial court, which was based on actual observation and conversation with the juror, is entitled to reasonable deference. See *United States* v. *Thompson,* supra; *State* v. *Hohman,* 138 Vt. 502, 512, 420 A.2d 852 (1980). Under the circumstances of this case, we cannot conclude that the trial court abused its broad discretion in denying the defendant's motion for a mistrial and motion for a new trial.

## II

The defendant next claims that the trial court erred in denying his motion to suppress the out-of-court and in-court identifications of the defendant made by Peter DiNello.

" ' "A defendant who moves to suppress identification evidence bears the initial burden of proving that the identification resulted from an unconstitutional procedure." ' *State* v. *Hinton,* 196 Conn. 289, 293, 493 A.2d 836 (1985); *State* v. *Fullwood,* 193 Conn. 238, 244, 476 A.2d 550 (1984). In order to succeed, 'the defendant must prove (1) that the identification procedures were unnecessarily suggestive, and (2) that the resulting identification was not reliable in the totality of circumstances.' *State* v. *Perez,* 198 Conn. 68, 73, 502 A.2d 368 (1985); *State* v. *Parker,* 197 Conn. 595, 598, 500 A.2d 551 (1985); *State* v. *Hinton,* supra, 292–93." *State* v. *Collette,* 199 Conn. 308, 310, 507 A.2d 99 (1986).

Prior to trial, the defendant filed a motion to suppress all identification testimony. At the suppression hearing, Detective Sergeant William Ludecke of the Southington police department testified that after the robbery of the Kwik Stop on May 3, 1984, he learned that a similar robbery had occurred in Newington and the description of the perpetrator fit the description of the individual involved in the Southington robbery. Ludecke requested that DiNello accompany him to

Newington for the purpose of having DiNello view a photographic array. Ludecke told DiNello that a man fitting the description he had provided had been arrested for a "very similar robbery" in Newington. When shown the pictures of six persons, DiNello positively identified the defendant as the individual who had robbed the Southington Kwik Stop.

At the suppression hearing, the six photographs were introduced into evidence. In each photograph, the individual was pictured wearing a Newington police department arrest placard clearly displaying the date of his arrest. DiNello testified that at the time he viewed the photographs he was under the impression that the Newington robbery had occurred after the Kwik Stop robbery. DiNello correctly interpreted the numbers on the placards as representative of dates. Four of the six placards showed dates of March 23, 1977, November 25, 1973, August 14, 1969, and May 15, 1976. The placards in the remaining two photographs showed the date of May 6, 1984. One of these two photographs depicted an individual with a thick moustache. The individual who had robbed the Kwik Stop just three days prior to the date on the placard had been described by DiNello as not having a moustache.

The defendant argues that when DiNello viewed the photographs at the Newington police department, he was aware that subsequent to the Kwik Stop robbery, the Newington police had arrested a similar looking individual for a similar robbery. The dates in the photographs indicated that only two of the individuals pictured had been arrested during this time frame and that of these two individuals, one of them did not fit the description DiNello had supplied to the police. The defendant therefore argues that the identification procedure employed in this case was unnecessarily suggestive and that the resulting identification was not reliable in the totality of circumstances.

Although the state concedes that the identification procedures employed in this case were unnecessarily suggestive, it argues, nonetheless, that the evidence presented at the suppression hearing was more than sufficient to support the trial court's finding that the identification in this case was reliable under the "totality of circumstances." We agree.

In determining whether an identification is reliable in the "totality of circumstances," the corruptive influence of the suggestive procedure is weighed against "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation." *Manson* v. *Brathwaite,* 432 U.S. 98, 114, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977); *State* v. *Collette,* supra, 311 n.3; *State* v. *Hinton,* supra.

Under the totality of the circumstances, DiNello's identification of the defendant was reliable. DiNello had the opportunity to view the defendant when for several minutes he was within two or three feet of the defendant. "We have said of identification that '*a* good hard look will pass muster even if it occurs during a fleeting glance.' (Emphasis added.) *State* v. *Ledbetter,* [185 Conn. 607, 615, 441 A.2d 595 (1981)]." *State* v. *Hinton,* supra, 296. DiNello testified that although a nylon stocking covered the perpetrator's head above his bottom lip, he was able to see the defendant's face through the stocking. DiNello's degree of attention was very good and his description accurate. See *State* v. *Collette,* supra, 311–12. In addition to giving a general description of his clothing ("dark clothing") and an approximation as to age ("in his . . . early 40's"), height (5'4") and weight ("between 145–163 pounds"), DiNello also noticed that the man had a "tan complexion" and a "round face" and appeared to need a shave.

Additionally, only nine days elapsed between the crime and the identification and DiNello stated that he was "positive" of the identification. Moreover, DiNello testified that he attached no special significance to the dates on the placards depicted in the photographs.[10] We conclude, therefore, that under the circumstances of this case, the suggestive procedures did not corrupt the overall reliability of DiNello's identification and that the trial court was justified in admitting the identification under the "totality of circumstances."[11] See *State* v. *Collette,* supra, 312–13.

There is no error.

In this opinion the other justices concurred.

---

[10] In his attack on the reliability of the identification, the defendant emphasizes DiNello's limited opportunity to view the perpetrator's face through the stocking mask. The defendant argues that "although DiNello testified that he could see through the stocking, his view was necessarily significantly impaired." The defendant acknowledges that many factors "certainly weigh in a finding of a reliable identification." He argues, however, that "in light of the fact that most of the robber's face was masked during the incident, the overall weight of these factors is lessened to the extent that they are outweighed by the corrupting effect of the suggestive procedure." We disagree. As the state correctly points out in its brief, there is nothing talismanic about the fact that a masked criminal, by virtue of his criminal preparations, has sought to impair a witness' opportunity to view the criminal. This court has held an identification of a masked criminal to be reliable under the "totality of circumstances." See, e.g., *State* v. *Boucino,* 199 Conn. 207, 221, 506 A.2d 125 (1986).

[11] Because of our conclusion that the out-of-court identification was reliable under the totality of the circumstances, we need not address the issue of the reliability of the in-court identification. See *State* v. *Davis,* 198 Conn. 680, 684, 504 A.2d 1372 (1986).