[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The petitioner, Michael Walker, pursuant to General Statutes §52-466, article first, §§ 8 and 9, of the constitution of Connecticut and the sixth and fourteenth amendments to the United States constitution filed a petition with this court for a writ of habeas corpus. Walker claims that (1) he received ineffective assistance of counsel from his trial attorney, Daniel Hagearty; (2) he was denied a fair trial in violation of his due process rights; and (3) he is actually innocent.[1]
For the reasons set forth below, the petition is dismissed. CT Page 11889
 I. Procedural and Factual Background
In 1987, Walker was charged "with murder in violation of General Statutes § 53a-54a. The jury, after twice deadlocking, found the defendant guilty of the charge." State v. Walker, 33 Conn. App. 763,763-64, 638 A.2d 1084 (1994), cert. denied, 229 Conn. 913, 642 A.2d 1209
(1994). Walker was sentenced to serve sixty years incarceration, to be served consecutively to a sentence he was then serving, in the custody of the commissioner of correction. Walker is presently in the custody of the respondent, commissioner of correction.
After sentencing, counsel failed to file appellate papers in a timely fashion. On April 6, 1990, Walker filed a pro se petition for a writ of habeas corpus, seeking to have his appellate rights restored and requesting that he be given a new trial or be released. On July 24, 1992, Walker's right of appeal was restored when the court entered orders in accordance with a stipulated agreement. "The defendant appeal[ed] from the judgment of conviction, alleging that (1) the trial court's instructions given prior to voir dire violated the defendant's constitutional rights, (2) the trial court's "Chip Smith' jury charge pursuant to State v. Smith, 49 Conn. 376 (1881), violated the defendant's constitutional rights, and (3) the evidence presented at trial was not sufficient to sustain the conviction." State v. Walker, supra,33 Conn. App. 764. The Appellate Court affirmed the trial court's judgment of conviction. See id., 763.
The Appellate Court determined that the jury reasonably could have found the following facts. "The victim, Sylvester Meade [also known as Vess], was shot and killed outside the Blue Hills Cafe in Hartford. Four witnesses identified the defendant as the person who shot the victim. CT Page 11890 Terry Meade, the victim's niece, testified that she saw the shooting while standing next to a car in front of the cafe, and saw the shooter run toward Adams Street in Hartford. She recognized the gunman as the defendant, but, because she was afraid of the defendant, did not immediately identify' him to the police, and instead gave the police a deliberately inaccurate description of the shooter.
"Lee Baskerville testified that he saw the defendant, whom he had seen before, fire shots at the victim and then run toward Adams Street. Baskerville identified the defendant as the gunman from a photographic array, and also identified the defendant at trial.
"Geraldine Conners testified that she heard gun shots while in her first floor apartment at 1347 Albany Avenue. She looked out a window and saw, in a well lit area, someone running from Albany Avenue toward Adams Street. About one year later, Conners selected a photograph of the defendant from a photographic array after viewing the array in her apartment. The following day, she again picked a photograph of the defendant from a photographic array, and gave a written statement to the police. At trial, Conners was not able to identify the defendant.
"Diane Sims, Conner's daughter, testified that she heard gun shots while in her second floor apartment at 1347 Albany Avenue. She looked out a window, and saw someone running through a vacant lot toward Adams Street. About one year after the shooting, when her mother was being shown the photographic array in her apartment, Sims entered the bedroom where the photographs were laid out on the bed. At that time, she told the police that she had seen someone the night of the shooting. The police asked her to look at the array, and she selected a photograph of the defendant. At trial, she was not able to identify the defendant.
"Three witnesses testified that the defendant was not the shooter. Eddie Gant testified that he witnessed the shooting from a distance of twenty feet. He stated that the shooter had light skin and curly hair, and that he had never before seen the person. He also testified that he knew the defendant, and would have recognized him if he had been the gunman. Prior to his in-court testimony, Gant had told a police officer that he had not seen the shooting.
"Burness Wallace and Lillian Threet both testified that at the time of the shooting they were together in a car across the street from the victim's car, and that the gunman had light skin. They also testified that they knew the defendant, and that they were sure the defendant was not the gunman. They both acknowledged that, although they knew that the defendant had been charged with the crime, they did not go to the police with their account. CT Page 11891
"At the time of the shooting, the defendant was in the custody of the department of correction, and living in the Watkinson halfway house as part of a work release program. The halfway house is approximately one mile from the caf On the evening of the crime, which occurred between 12:45 and 1 a.m., the defendant had left the house on an authorized furlough and was not there at 10 p.m., but was present at midnight and at 2 a.m. for facility head counts. The log indicated that the defendant had also signed out at about 11 p.m., and had returned about twenty minutes later, although he failed to sign in.
"The defendant was assigned to room twenty-six on the second floor of the house. The whereabouts of those assigned to the house were monitored, most notably by means of a head count at two hour intervals. In order to leave or enter the facility after midnight, a resident had to check in with a counselor. Windows on the first floor were locked, but windows on the second and third floors were not. Residents were not confined to their rooms at night.
"The facility had had security problems. First floor windows, which residents had access to, had been found unlocked, and other windows had been broken. A drainpipe that ran down from the room adjacent to the window of the defendant's room had been pulled away from the building. A counselor at the facility testified that a resident could get out of the facility undetected between midnight and 2 a.m. Another counselor testified that it was possible to get back into the facility undetected."State v. Walker, supra, 33 Conn. App. 764-66.
The Appellate Court concluded that, "[i]n this case, the jury reasonably could have found that the evidence established guilt beyond a reasonable doubt. The jury reasonably could have concluded from the testimony presented at trial that the defendant left the halfway house undetected after the midnight head count, committed the crime outside the cafe, and returned to the facility in time for the 2 a.m. count. Although conflicting testimony was presented at trial, it is within the province of the jury to decide which witnesses are credible and which are not. We conclude, therefore, that the evidence was sufficient to sustain the conviction." State v. Walker, supra, 33 Conn. App. 774.
Consequently, the Appellate Court affirmed the conviction on March 22, 1994; See State v. Walker, supra, 33 Conn. App. 763; and certification was denied by the Supreme Court on April 28, 1994. See State v. Walker, supra, 229 Conn. 913. On May 6, 1994, the Superior Court issued an order setting forth a pleading schedule. On June 19, 1996, after numerous continuances and extensions of time in which to file, Walker filed an amended petition. On April 28, 1998, Walker filed his third amended CT Page 11892 petition and on June 5, 1998, the respondent filed an amended return. On July 6, 1998, Walker filed a reply to the amended return. The habeas hearing took place on various dates from May 27, 1998 through November 6, 1998. On January 31, 2000, Walker filed his trial brief and on May 30, 2000, the respondent filed its trial brief. On June 9, 2000, Walker filed his reply brief.
 II. Factual Findings from Habeas Proceeding
The court finds the following facts, that are necessary for the disposition of this matter from the evidence produced at the habeas hearing.[2] This outhne of the facts includes the court's findings with respect to important witnesses, the investigation conducted by the police, the shooter's complexion and the lighting at the scene of the shooting.
 A. Lee Baskerville
Lee Baskerville was an important witness in the state's case at the criminal trial and for the petitioner in the habeas matter. A review of Baskerville's trial testimony shows that he was well spoken, thoughtful and somewhat short tempered. At the probable cause hearing[3] and the trial,[4] Baskerville did not waiver in his identification of Walker as the person who shot the victim. At the habeas hearing, however, Baskerville offered a weak recantation of his previous testimony. (Transcript of Habeas Hearing, September 10, 1998 [Transcript XVI], p. 78; Transcript of Habeas Hearing, September 11, 1998 [Transcript XVII], pp. 16-18, 34-35, 75-76, 100-107.) Baskerville's habeas testimony contained foggy or vague recollections although he testified that his present memory of the shooting, some nine years after the events, is more accurate than his testimony at the trial.[5] The court finds this assertion is not credible.[6] Baskerville's recantation of his identification of Walker, in stark contrast to his unequivocal testimony at the probable cause hearing and trial, was not certain. (Transcript XVI, p. 78; Transcript XVII, pp. 16-18, 34-35, 75-76, 100-07.)
The court finds that Baskerville's sworn statement, given about a year after the shooting (Pet. Ex. 85), his testimony at the probable cause hearing (Pet. Ex. 1, pp. 6-32) and his testimony at the criminal trial (Pet. Ex. 6, pp. 133-73) were consistent. The court agrees with the petitioner that Baskerville's statement as reported by the police about a month after the shooting (Pet. Ex. 68) is somewhat inconsistent with the aforementioned statement and testimony. That inconsistency, however, is explained by Baskerville's fear, which almost certainly can be attributed CT Page 11893 to the petitioner.[7] Baskerville would have been most fearful shortly after the shooting because Walker was in a halfway house with access to the streets, but his fear would have diminished by the time of the probable cause hearing and trial because Walker was then securely in the custody of the state.
On four different occasions during those proceedings Baskerville was questioned and answered emphatically that Walker was the person that he saw shoot Vess. These and other factors lead this court to conclude that Baskerville's weak recantation at the habeas hearing some eleven years after the events should be given little, if any, evidentiary weight.
 B. TerrvMeade
Terry Meade, Vess' niece, was also a witness for the state at the trial. A review of the criminal trial transcript reveals that Meade was not very accurate regarding the details of the shooting; (Pet. Ex. 6, pp. 100-30); and she implicitly admitted to smoking an illegal substance on the night of the shooting. (Pet. Ex. 6, p. 114.) Nevertheless, Meade was consistent at the trial in explaining that she had known Walker for many years; (Pet. Ex. 6, p. 104); and she was clear in identifying Walker as the shooter; (Pet. Ex. 6, pp. 104, 109, 111). Meade's testimony at trial corroborated Baskerville's testimony that Walker shot Vess, despite its other inherent weaknesses.
At the habeas hearing, Meade admitted openly that on the night of the shooting she had smoked marijuana and consumed three beers. (Transcript of Habeas Hearing, September 25, 1998 [Transcript XIX], p. 10.) During her habeas testimony, Meade had great difficulty remembering details of the shooting and also appeared to have been traumatized by the shooting of her uncle. Furthermore, the court does not accept the explanation offered by Meade at the habeas hearing regarding the rational for her initial misdescription of the shooter in her statement to the police. (Transcript XIX, pp. 57-58.) If, as Meade testified at the hearing, she was not afraid of Walker, but was afraid of testifying at trial, she probably would have told the police that she had not observed the shooting at all, rather than give an incorrect description of the shooter. The court concludes that Meade's habeas testimony is of little value in determining the outcome of this habeas action.
 C. Investigation by the Police
Detectives[8] Marrero and Vera were the lead investigators in the murder of Vess. (Transcript of Habeas Hearing, June 9, 1998 [Transcript IV], p. 15.) Based on his experience and instincts, Marrero believed that the description of the perpetrator was tainted at the scene. (Transcript CT Page 11894 of Habeas Hearing, May 27, 1998 [Transcript I], pp. 120-21; Transcript of Habeas Hearing, May 29, 1998 [Transcript III, p. 67.) Rather than having tunnel vision, as Walker would have this court believe, Marrero relied on his experience and training in deciding where to focus his investigative resources. The court finds that the testimony of Marrero and the other officers at the habeas hearing was straightforward and honest. This finding is buttressed by Marrero's admission that some actions of the police in investigating Vess' murder were not in keeping with general police guidelines. Nevertheless, there is no credible evidence before this court to indicate any lack of veracity on the part of Marrero or any of the other officers, nor is there sufficient credible evidence to conclude that the police targeted the petitioner to the exclusion of any other persons in their investigation.
 D. Lighting at the Scene and the Shooter's Skin Color
The skin color and complexion of the shooter and the lighting at the crime scene are important issues because they affect the various witnesses' ability to accurately describe the shooter. The lighting both inside and outside of the Blue Hills Cafe is important because certain witnesses testified that they saw Walker on the night of the shooting inside the cafe and others saw him outside.
Baskerville testified that on the night of the shooting the cafe was very well lit. (Pet. Ex. 2, p. 14.)[9] The lighting outside the cafe at the time of the shooting was very good considering that the shooting took place at approximately 1 o'clock in the morning.[10] Terry Meade, Knighton and Wallace testified that the shooting took place near the victim's car which was parked below a street light.[11] (Pet. Ex. 6, pp. 106-06, 178, 319.) Marrero, who was on duty at the scene shortly after the shooting, testified at the habeas hearing that the victim's car was parked directly underneath a street light and that the light washed out the color in the complexion of people who stood, walked or ran underneath the light. (Transcript I, p. 124.) Marrero explained that "under a light [a] person could be light skinned." (Transcript II, p. 36.) Therefore, in conducting their investigation, the police took the lighting conditions into consideration when using the description given by a number of witnesses that the shooter was a light skinned black male. (Transcript I, p. 123-24.)
The jury was well aware that many witnesses at the crime scene described the shooter as light skinned.[12] The jury also had the opportunity to view the petitioner's skin color throughout the course of the trial. Moreover, Baskerville identified Walker as the shooter at trial. Additional findings of fact from the evidence produced at the habeas hearing will be included in the analysis of each count, sections CT Page 11895 III through V, infra, as needed.
 III. Ineffective Assistance of Counsel
The four counts of the third amended petition are evaluated here in the same order that they were presented in Walker's post habeas hearing memorandum. First, Walker argues that he was denied effective assistance of counsel.[13]
"The petitioner, as the plaintiff in a habeas corpus proceeding, bears a heavy burden of proof." Lubesky v. Bronson, 213 Conn. 97, 110,566 A.2d 688 (1989). A claim of ineffective assistance of counsel may be asserted by a petition for a writ of habeas corpus. See Lozada v.Warden, 223 Conn. 834, 613 A.2d 818 (1992); State v. Leecan, 198 Conn. 517,541, 504 A.2d 480, cert. denied, 476 U.S. 1184, 106 S.Ct. 2922,91 L.Ed.2d 550 (1986). Connecticut follows the two-pronged test for evaluating the performance of trial counsel articulated in Strickland v.Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). SeeLevine v. Manson, 195 Conn. 636, 639, 490 A.2d 82 (1985); Nieves v.Commissioner, 51 Conn. App. 615, 724 A.2d 508 (1999), cert. denied,248 Conn. 905, 731 A.2d 309 (1999). "[T]he defendant must establish not only that his counsel's performance was deficient, but that as a result thereof he suffered actual prejudice, namely, that there is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceeding would have been different." (Emphasis added; internal quotation marks omitted.) Nieves v. Commissioner, supra, 620. "Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." (Internal quotation marks omitted.) Fair v. Warden,211 Conn. 398, 402, 559 A.2d 1094 (1989), cert. denied, 493 U.S. 981,110 S.Ct. 512, 107 L.Ed.2d 514 (1989). Thus, the "petitioner must make a two-fold showing: (1) that his counsel's performance fell below the required standard of reasonable competence or competence displayed by lawyers with ordinary training and skill in the criminal law; and (2) that this lack of competency contributed so significantly to his conviction as to have deprived him of a fair trial." (Internal quotation marks omitted.) Valeriano v. Bronson, 209 Conn. 75, 85-86, 546 A.2d 1380
(1988); accord Mozell v. Commissioner, 51 Conn. App. 818, 820, 725 A.2d 971
(1999).
"In reviewing the claim, this court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under these circumstances, the challenged action might CT Page 11896 be considered sound trial strategy. . . . In assessing the petitioner's claim, this court must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." (Citations omitted; internal quotation marks omitted.) Magnotti v. Meachum, 22 Conn. App. 669, 674-75, 579 A.2d 553
(1990). "[I]t is perfectly consistent for even a lawyer who commits a grievous error — whether due to negligence or ignorance — to be deemed to have provided competent representation." (Internal quotation marks omitted.) Valeriano v. Bronson, supra, 209 Conn. 87, citingWainwright v. Sykes, 433 U.S. 72, 105 n. 6, 97 S.Ct. 2497, 53 L.Ed.2d 594
(1977). "Representation is an art, and an act or omission that is unprofessional in one case may be sound or even brilliant in another. Even if a defendant shows that particular errors of counsel were unreasonable, therefore, the defendant must show that they actually had an adverse effect on the defense." Strickland v. Washington, supra,466 U.S. 693. "Defendants are entitled to reasonably professional assistance, not perfect representation." Ostolaza v. Warden,26 Conn. App. 758, 775, 603 A.2d 768, cert. denied, 222 Conn. 906,608 A.2d 692 (1992). "Errorless counsel . . . is not required." State v.Barber, 173 Conn. 153, 159-60, 376 A.2d 1108 (1977).
Walker alleges eleven deficiencies in Hagearty's representation of him during the trial. (Pet. Brief, pp. 31-33.)[14] Walker argues that these errors, taken alone or in combination, prejudiced him, thereby effectively denying him an opportunity for a fair trial. (Pet. Brief, pp. 33-68.) For purposes of clarity in evaluating these claims, the court has grouped these claims into four distinct categories: (A) failure to discredit the state's case; (B) failure to prepare a defense; (C) failure to investigate; and (D) procedural failures.
 A. Failure to Discredit the State's Case
Walker claims that Hagearty failed to adequately use materials and present information to cross examine and impeach the prosecution's witnesses. (Third Amended Petition, Count Three, ¶¶ 14, 23, 37.) Specifically, Walker claims that Hagearty's performance was deficient because he failed to use available information to discredit the state's witnesses and raise reasonable doubt in the state's case. Walker makes numerous allegations to support these claims.
Walker first alleges that he was prejudiced by Hagearty's failure to impeach Terry Meade with the inconsistencies between her trial testimony and her prior statements regarding whether she had seen the shooter and whether she caught her uncle before he fell to the ground. (Pet. Brief, pp. 39-41, 59.) The jury, however, was exposed to most of Meade's CT Page 11897 inconsistencies during direct examination.[15] Many inconsistencies that were not exposed to the jury were inconsequential. Furthermore, any exploration of the inconsistencies on cross examination may have opened the door for Meade to explain these inconsistencies by describing her fear of Walker and the basis of that fear. Thus, Hagearty's conduct in relying on the prosecutor's disclosure of the inconsistencies and not giving Meade an opportunity on cross examination to describe her fear was reasonable under the circumstances.[16]
Walker also repeatedly argues that much of the evidence in this case was admissible at trial for its truth under State v. Whelan, 200 Conn. 743,513 A.2d 86, cert. denied, 479 U.S. 994, 107 S.Ct. 597, 93 L.Ed.2d 598
(1986). For instance, Walker asserts that Hagearty's performance prejudiced him because Hagearty failed to introduce, as substantive evidence under Whelan, "Mead's sworn statement to the effect that the shooter was light skinned . . . [and] Meade's statement that she did not think she could identify the shooter. . . ." (Pet. Brief, p. 41.)
While it may be true that Meade's statement, Pet. Ex. 53, was technically admissible under Whelan, Walker was not prejudiced by Hagearty's failure to introduce the statement because Meade testified during direct examination about her prior inconsistent statements to the police. The introduction of Meade's statement, Pet. Ex. 53, would not have added any significant information to what the jury already knew. Therefore, it cannot be said that Hagearty's failure to introduce this statement was unreasonable or that it prejudiced Walker. Hence, Walker fails to meet his burden under either prong of Strickland, and, therefore, this claim of ineffective assistance of counsel must fail. SeeStrickland v. Washington, supra, 466 U.S. 687; Nieves v. Commissioner, supra, 51 Conn. App. 620.
Next, Walker alleges that he was prejudiced by Hagearty's failure to elicit Baskerville's prior inconsistencies, including Baskerville's initial description that the shooter was light skinned, held the gun in his right hand and that he selected of a "look-a-like" photograph of Steven Ross. Hagearty knew, however, that Baskerville testified at the probable cause hearing that he was scared; (Pet. Ex. 1, p. 24); and the context of that testimony indicated that Baskerville was afraid of Walker. Therefore, Hagearty had to be careful regarding what inconsistencies to expose because Hagearty wanted to avoid Baskerville testifying at trial that he was afraid of Walker. Cross examination of Baskerville regarding these alleged inconsistencies may have opened the door for the state to elicit testimony of Baskerville's fear as a way of explaining any prior inconsistent statements.
Moreover, Hagearty had Baskerville set a time line that was consistent CT Page 11898 with Walker's alibi. This was a critical fact since neither the petitioner nor any other witness established this fact at trial.[17]
Therefore, Hagearty made a reasonable strategic decision not to impeach Baskerville with the alleged inconsistencies.
Walker next alleges that Hagearty failed to use information in the police reports to cross examine Marrero concerning various descriptions of the shooter given to the police. (Pet. Brief, pp. 43-49, 61.) The jury, however, heard numerous descriptions of the shooter throughout the case as light skinned and, nevertheless, convicted Walker. The jury also had the opportunity to view Walker during the testimony of numerous witnesses who described the shooter as light skinned. It is unlikely that additional evidence of light skinned descriptions would have had any significant impact on the jury. There was no prejudice to Walker and, thus, this allegation fails to satisfy the second prong of Strickland. See Strickland v. Washington, supra, 466 U.S. 687; Nieves v.Commissioner, supra, 51 Conn. App. 620.
Walker also alleges that he was prejudiced by Hagearty's failure to show that Conners may have seen another black male run past her window. (Pet. Brief, pp. 48, 67.) Walker argues that "[t]he information that more than one black male ran down Adams Street immediately after the shooting was never used by defense counsel to cast doubt on whether the runner Geraldine Conners saw was the gunman or one of his pursuers." (Pet. Brief, p. 48.) This allegation is not supported by the evidence presented at the habeas hearing. The court finds that there is no evidence that anyone other than the shooter ran down the path in the empty lot next to Conners' house. It is speculation that Conners may have seen a second person chasing the shooter. Walker presented no evidence that Hagearty had available any evidence that he could have used to explain or discredit Conners's testimony.
Walker argues that there is evidence that Gant and perhaps another black man chased the shooter down the path. Gant's testimony at the trial was unclear regarding whether he chased the suspect down the path. (Pet. Ex. 6, pp. 246-47, 253, 257-5 8.) In fact, Grant testified that he did not get very far before he stopped chasing the shooter and ran back to Vess. (Pet. Ex. 6, pp. 246-47, 257-5 8.) Gant testified at the habeas hearing that he ran through some bushes; Gant never stated that he ran down the path in the empty lot. (Transcript of Habeas Hearing, October 2, 1998 [Transcript XXI], pp. 3-4.) Walker also relies on Tony Womack's comment to the police that "Eddie Gant had chased the suspect down Adams St." (Pet. Ex. 18, p. 4.) Womack, however, was not a witness at the habeas hearing and Walker offered no evidence that his trial testimony would have been helpful.[18] Walker also offered no evidence that Conners saw the runner stop and reverse direction. Additionally, another CT Page 11899 police report, Pet. Ex. 28, indicates that Betty Stanford told the police that Gant, in pursuing the shooter, ran only to the corner of Albany Avenue and Adams Street, not down the path in the empty lot. (Pet. Ex. 28.)
Walker relies on this police report, Pet. Ex. 28, to show that Stanford also told the police that an unknown black male who had been "hitting on her" in the bar that night later told her that he had chased the suspect down Adams Street. (Pet. Ex. 28.) Stanford and the unknown black male were not witnesses at the habeas hearing. Moreover, Walker offered no evidence to show that Stanford and the unknown black male were available at the time of the trial or that their trial testimony would have helped Walker. The comment in the police report was hearsay and, therefore, not admissible at trial.
The petitioner bears the burden of proof and has presented no evidence to support the allegation that Conners saw Gant or another male, rather than the shooter, run down the path. Therefore, the court finds that Hagearty did not breach his obligation to act as a reasonably competent defense attorney when he did not attempt this proof.
Walker next alleges that he was prejudiced by Hagearty's failure to impeach Conners with her comment on the dispatch tape that she could not tell the runner's skin color. Conners' dispatch tape comment[19] has little impeachment value because it was made while Conners was obviously excited, nervous and possibly afraid since the shooting had just occurred.[20] (Pet. Ex. 8; Pet. Ex. 9.) Furthermore, the tape and transcript of Conners' telephone call to the police show that Conners explained she would try to give a description to officers when they arrived at the scene. (Pet. Ex. 8; Pet. Ex. 9.) Conners later gave a description of the shooter, Pet. Ex. 80, and selected a photograph of Walker, Pet. Ex. 121 G, as the man she thought she saw run past her window. Conners was unable to make an in-court identification at trial. (Pet. Ex. 6, pp. 51-52.) Based on the foregoing, the court finds that Conners' statements were not inconsistent.
 B. Failure to Prepare and Present the Defense
Walker claims that Hagearty failed to adequately prepare for trial and, in particular, failed to prepare the alibi defense. (Third Amended Petition, Count Three, ¶¶ 12, 13, 20, 21.) Walker alleges that Hagearty failed to attempt to locate Brandon Walker, an employee of the halfway house who might have corroborated his alibi.[21] (Pet. Brief, pp. 49-50.) This claim fails because Walker has not proven what evidence Brandon Walker would have provided or that it would have helped the defense. This court has no evidence that Brandon Walker CT Page 11900 would have corroborated the alibi or provided any helpful testimony for Michael Walker. In fact, Brandon Walker testified for the state at the trial as a rebuttal witness and that testimony was damaging to the petitioner because it weakened the alibi defense. Thus, the petitioner has not shown either an unreasonable decision or any prejudice as a result of Hagearty's alleged failure.
The petitioner also claims that Hagearty should have developed the alibi defense in greater detail, for example, by seeking out his roommate to testify. The court notes that there is no evidence that Hagearty failed to try and find Walker's roommate. Moreover, the petitioner failed to demonstrate that his roommate's testimony would have been helpful because the roommate did not testify at the hearing.
Walker next alleges that Hagearty failed to adequately utilize information available to the defense to bolster Threet's trial testimony. (Pet. Brief, pp. 51-52, 64.) Threet and Wallace were sitting in a car on Albany Avenue across from the Blue Hills Cafe at the time of the shooting, about 60 feet away from the shooter. (Pet. Ex. 6, pp. 334-3 5; 343.) Threet testified at trial on behalf of the defense that the shooter was light skinned. Walker argues that Hagearty permitted the jury to infer that Threet did not go to the police to report what she saw until long after the incident and therefore cast doubt on Threet's credibility. This allegation fails because Threet testified at trial that she gave a description of a light skinned black male to the police on the night of the shooting. (Pet. Ex. 6, pp. 346, 353.)
The petitioner also claims that Hagearty should have shown the jury a picture of an individual who Threet identified as a "look-a-like" picture of the shooter, Pet. Ex. 129. Threet testified that the shooter was facing sideways and she did not have a clear view of his face. A reasonable defense attorney may have concluded that introducing the picture selected by Threet would have minimal value in proving Walker's innocence because Threet stated the photograph "was not a match." (Pet. Ex. 13, p. 2.)
Walker also argues that Hagearty failed to prepare to counter the cross examination and impeachment of Gant. (Pet. Brief, p. 53.) In particular, Walker relies on the opinion of Paul Thomas[22] that, because of Hagearty's lack of preparation, "the jury was left . . . with the impression that a witness who knew nothing . . . was being offered as . . . the defense's first witness." (Pet. Brief, p. 53.) A review of the trial transcript reveals weaknesses in Gant's testimony. During cross examination, Gant claimed that on the night of the shooting he could see all the way to the corner of Adams Street and Albany Avenue from inside the cafd. (Pet. Ex. 6, p. 255.) Gant also testified that Vess' car was CT Page 11901 only twenty feet from where he stood inside the cafe. (Pet. Ex. 6, p. 255.) From the facts before the court, these assertions are not credible. Also, Gant's testimony on cross examination was somewhat inconsistent with his testimony on direct examination. For instance, Gant testified on direct examination that he never saw the front of the shooter, but he knew Walker was not the shooter. (Pet. Ex. 6, pp. 249-52.) On cross examination, however, Gant testified that he saw the shooter's face, but not well enough to describe the shooter although he could tell that the shooter was light skinned. (Pet. Ex. 6, pp. 256-57.)
Despite these problems, the cross examination of Gant was not as "devastating" as Walker asserts. For instance, rather than leaving the impression that Gant had no first hand knowledge of the events, he testified clearly and directly on cross examination that he observed the shooting. (Pet. Ex. 6, p. 259.) Also, Gant's repeated testimony that the shooter was light skinned supported Walker's identification and alibi defense.
No evidence was presented at the hearing that Hagearty knew or should have known that Gant would change some of his testimony from direct examination to cross examination. An attorney is no guarantor of the performance of a witness on the stand. Hagearty cannot be held responsible for Gant's weaknesses as a witness, especially in light of the fact that Gant gave testimony that was helpful to Walker. A reasonably competent attorney would be strategically justified to do as Hagearty did in this case. Hagearty called the next witness without any redirect examination of Gant because it may have opened the door to more harmful testimony and recross examination.[23]
Walker also alleges that he was prejudiced by Hagearty's failure to use information regarding the descriptions given by Rene Henry and Leon Allen that the shooter was right handed, light skinned, short and of slight build.[24] (Pet. Brief, p. 52.) This alleged failure, however, did not prejudice Walker because the jury heard numerous descriptions of the shooter and still convicted Walker. There is no reasonable probability that Walker was prejudiced by Hagearty's decision not to present to the jury additional cumulative evidence of the varying descriptions of the shooter.
C. Failure to Investigate
The petitioner alleges that Hagearty's investigation of the case was deficient. (Third Amended Petition, Count Three, ¶¶ 15-18; Pet. Brief, p. 53.) This deficiency claim is based upon allegations that counsel failed to: (1) rely upon information available in the state's file; (2) continue the investigation after January of 1988; (3) CT Page 11902 "`investigate sufficiently to feel confident that the alibi . . . is pinned down without holes" including investigation of the halfway house records, speaking with residents of the facility and staff members; (4) locate Reynolds; (5) investigate the possibility that Conners saw someone other than the shooter run by her window; (5) properly use and supervise the defensess investigator, Gates; and (6) locate additional witnesses who identified the shooter as light skinned.
Prior to addressing these individual claims, the court notes that the petitioner faces a particularly difficult task in sustaining its burden of proof. The death of trial counsel leaves a gap in the proffered evidence at the habeas hearing as to the scope and intensity of the investigation, if any, beyond Gate's investigation. There is no credible evidence that Hagearty did not review in detail the state's file and there is no evidence that Hagearty did not conduct his own investigation in addition to Gates' investigation for the petitioner. Even assuming arguendo that the investigation was incomplete as alleged, the petitioner also fails to satisfy the prejudice prong of the Strickland test with respect to the claims of failure to investigate. See Strickland v.Washington, supra, 466 U.S. 687; Nieves v. Commissioner, supra,51 Conn. App. 620.
Walker alleges that Hagearty failed to adequately obtain information through discovery or the "open file" policy and become familiar with police reports. (Pet. Brief, p. 53.) Walker relies on statements made by Hagearty during jury selection and at trial to support this allegation.[25] (Pet. Reply Brief, pp. 7-8.)
The court does not find that these statements support Walker's allegations. Hagearty's statement, "We have our own investigator, and I am not going to rely upon the state's information" does not prove that Hagearty did not adequately review the state's evidence. Rather it shows that he conducted an independent investigation. Moreover, the court finds that there is evidence that Hagearty took advantage of the open file policy[26] by visiting the state's attorney's office on several occasions; (Transcript of Habeas Hearing, July 9, 1998 [Transcript XI], pp. 36-38); Transcript of Habeas Hearing, Transcript, July 14, 1998 [Transcript XII], pp. 97-100); and obtaining copies of numerous different police reports (Transcript of Habeas Hearing, June 10, 1998 [Transcript V], pp. 2-46). Furthermore, Walker offered no evidence of any undiscovered information that would have helped the defense in support of his allegation that Hagearty failed to adequately investigate. Likewise, Walker offered no evidence to support his allegation that Hagearty failed to investigate after January 1988 or that any helpful information was overlooked because of this alleged failure to investigate. Accordingly, the court finds that these claims fail to satisfy either prong of CT Page 11903Strickland. See Strickland v. Washington, supra, 466 U.S. 687; Nieves v.Commissioner, supra, 51 Conn. App. 620.
Similar reasoning applies to Walker's allegations that Hagearty failed to fully develop the alibi defense by adequately investigating the halfway house, obtaining halfway house records and interviewing halfway house personnel and residents. (Pet. Brief, pp. 49-50, 55-57, 64-65.) Walker offers no evidence that Hagearty failed to conduct such an investigation or that such an investigation would have provided information helpful to the defense. For instance, although Walker alleges that Hagearty failed to try to locate Brandon Walker, a halfway house employee, or Walker's halfway house roommate, Walker offers no evidence regarding what either witness would have said or demonstrating that they would have provided helpful information. Accordingly, the court finds that Walker fails to meet the either prong of the Strickland standard. See Strickland v. Washington, supra, 466 U.S. 687; Nieves v.Commissioner, supra, 51 Conn. App. 620.
Walker also alleges that Hagearty failed to investigate and locate Reynolds. (Pet. Brief, p. 55.) Walker, however, once again offers no evidence to support this allegation. Walker did not produce Reynolds at the habeas hearing or provide any evidence as to what Reynolds would have said had he been located. Since the information in the police report regarding Reynolds was not admitted for its truth; (Transcript I, pp. 17-18); Walker is merely speculating that Reynolds' testimony would have helped the defense. The court, therefore, finds that Walker fails to satisfy either prong of the Strickland standard. See Strickland v.Washington, supra, 466 U.S. 687; Nieves v. Commissioner, supra,51 Conn. App. 620.
Walker further alleges that Hagearty did not fully investigate the possibility that Conners saw someone other than the shooter run down the path. Walker presented no evidence to support this allegation. Moreover, the police reports generally indicate that no one else ran down the path. See § III. A., supra. Accordingly, the court concludes that Walker fails to satisfy the first prong of the Strickland standard. SeeStrickland v. Washington, supra, 466 U.S. 687; Nieves v. Commissioner, supra, 51 Conn. App. 620.
Walker also alleges that Hagearty improperly used and supervised Donald Gates, the investigator for the defense. (Pet. Brief, pp. 53, 63-64.) Gates, a state certified private investigator for approximately eleven years, was previously employed by the Hartford Police Department for twenty-five years and rose to the rank of captain. (Transcript IV, p. 103.) Walker offered no evidence that Hagearty did not conduct his own investigation in addition to Gates' investigation or that helpful CT Page 11904 information was missed because Hagearty failed to properly use or supervise Gates.[27] Accordingly, this allegation also fails to satisfy either prong of the Strickland standard. See Strickland v. Washington, supra, 466 U.S. 687; Nieves v. Commissioner, supra, 51 Conn. App. 620.
Lastly, Walker alleges that Hagearty's performance was deficient because he failed to look for other witnesses who identified the shooter as light skinned. (Pet. Brief, 53.) Walker offers no evidence to support this allegation. It is possible that Hagearty knew about other witnesses and chose not to call them. Walker's speculation that Hagearty did not look for other witnesses is not evidence of any deficient performance by Hagearty and therefore Walker fails to satisfy the first prong ofStrickland. See Strickland v. Washington, supra, 466 U.S. 687; Nieves v.Commissioner, supra, 51 Conn. App. 620.
 D. Procedural Failures
Walker next alleges that Hagearty's performance was ineffective because of numerous procedural failures.
 1. Failure to File Motion to Suppress
Walker alleges that Hagearty erred in failing to pursue a motion to suppress the identification of Walker as the person who shot Vess. Specifically, Walker argues that Hagearty should have moved to suppress Conners' dispatch tape comment as well as Baskerville's and Meade's identification of Walker. (Pet. Brief, pp. 57-59, 67-78.) (Third Amended Petition, Count Three, ¶ 22.)
Walker argues that Hagearty should have filed a motion to suppress the identification testimony because the testimony was unreliable due to, among other things, suggestive police tactics so as to constitute a due process violation.[28] Since, as explained, infra, § W. A., the court finds no factual basis to support Walker's due process identification claim, Walker's argument that Hagearty should have filed a motion to suppress must also fail.[29] The court finds that it was not ineffective assistance not to move to suppress because there was no basis for suppressing the identification.
 2. Failure to Object
Walker also alleges that Hagearty's performance was deficient because he failed to object to "hearsay statements and irrelevant and prejudicial information adduced by the prosecutor at trial." (Third Amended Petition, Count Three, ¶ 25.) Specifically, Walker argues that Hagearty failed to object to the admission of Marrero's testimony that CT Page 11905 Sims identified a photograph of the shooter. (Pet. Brief, pp. 33, ¶ 1-63; see also Pet. Reply Brief, p. 10.) Walker argues that during the trial, Sims denied making an out-of-court photo identification. Based on this factual premise, Walker argues Hagearty should have objected to Marrero's testimony that Sims had made an out-of-court photo identification. Walker argues that "once Sims denied that she had made an identification from the array, there was no tactical reason not to interpose an objection to Marrero's testimony claiming Sims had made such an identification." (Pet. Brief, p. 61.) Walker's argument fails, however, because Paul Thomas' statement, that Sims denied making an out-of-court photo identification,[30] is incorrect. Sims explained at trial that she selected a photograph from the same array that was also shown to her mother, Conners. (Pet. Ex 6, pp. 91-99.) While there may have been some confusion in Sims' testimony as to the date that she the selected two photographs and experienced difficulty deciding between the two, a close reading of the trial transcript reveals that Sims' selection of the two photographs was most likely on the day of her trial testimony, perhaps shortly before she testified in court.[31] Sims' testimony, that she was unable to recall which of the two photographs was the one she selected when she initially looked at photographs with her mother,[32] does not detract from the fact that she initially selected one photograph.[33] Also, one of the two photographs that Sims selected (presumably on the morning of her trial testimony) was the same photograph of Walker, Pet. Ex. 121 G, that Conners and Sims originally selected.[34]
(Pet. Ex. 6, pp. 91-99.) Furthermore, Conners testified that Sims, without being prompted by Conners, initially chose the same picture of Walker. (Pet. Ex. 6, pp. 52-53.) Therefore, this court finds that Sims, when asked to look at the photographic array in July 1987, selected a photograph of Walker, Pet. Ex. 121 G. Furthermore, during Sims' testimony at trial, she did not deny making the out-of-court photographic identification in 1987.[35] (Pet. Ex. 6, pp. 91-99.)
Sims testified at trial as to the facts and circumstances surrounding her identification,[36] and Sims was available at trial for cross examination. Since Walker's claim, that Sims' out-of-court identification was unreliable because Sims could not decide between the two photographs, fails, Walker fails to meet his burden of showing that there was a basis for Hagearty to object to Marrero's testimony. The court finds no evidence that Hagearty's performance was deficient in failing to object and, accordingly, Walker fails to meet his burden of proof under the first prong of Strickland. See Strickland v. Washington, supra,466 U.S. 687; Nieves v. Commissioner, supra, 51 Conn. App. 620.
 3. Failure to Preserve Issues for Appeal
Walker also alleges that Hagearty failed to "properly preserve issues CT Page 11906 for appellate review." (Third Amended Petition, Count Three, ¶ 44.) Specifically, Walker argues that he was prejudiced by Hagearty's "failure to raise and preserve the marshaling issue and the suppression of identification testimony" because it precluded Walker's appellate counsel from raising these issues on appeal. (Pet. Brief, pp. 16-17, 68.) Based on the court's conclusion regarding suppression in § III. D. 1., supra, there was no suppression issue for Hagearty to preserve for appeal and therefore Hagearty's performance was not deficient on that matter.
Walker relies on alleged misstatements of the facts in the jury charge to support his claim that the court improperly marshaled the evidence. Specifically, Walker claims that the jury instructions presented the prosecution's view of Gant's and Meade's inconsistent statements, referred to Conners and Sims as having identified the defendant and included comments about unlocked windows and a dislodged drainpipe at the halfway house.[37] The court finds that there is no evidence of prejudice to Walker because, as explained in § W. C., infra, any challenge to the jury instructions, which Walker argues Hagearty should have made, would have failed.
In summary, the court finds that Hagearty's assistance was not ineffective. This conclusion is based in part on a number of recurring problems in Walker's claims of ineffective assistance of counsel. Walker's claims, considered individually as well as cumulatively, do not show that Hagearty was ineffective. Moreover, many of the claims and arguments made by Walker at the hearing are factually and legally inaccurate. Walker's case is also built on hearsay[38] and speculation, therefore, he fails to show any prejudice as required by the second prong of Strickland. SeeStrickland v. Washington, supra, 466 U.S. 687; Nieves v. Commissioner, supra, 51 Conn. App. 620. Accordingly, the court concludes that Walker fails to meet his burden of proof under either prong of the Strickland
test for ineffective assistance of counsel. The court does not find that Hagearty's "conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland v. Washington, supra, 466 U.S. 686.
 IV. Due Process and Prosecutorial Misconduct[39]
Walker next claims that he was denied a fair trial in violation of the due process of law as guaranteed by article first, §§ 8 and 9, of the constitution of Connecticut and the fourteenth amendment to the United States constitution. This claim is based on allegations that: (1) unreliable photographic and in court identifications violated Walker's due process rights; (2) certain alleged conduct of the prosecutor violated Walker's due process rights; and (3) the trial court's instructions to the jury were in error. CT Page 11907
A. Identification of Walker
Walker alleges that the identification testimony presented at trial, and the procedures used to obtain the identification testimony, "were so unreliable as to violate the due process guarantees of the state and federal [constitutions]." (Third Amended Petition, Count Four, ¶¶ 12, 13.) Specifically, Walker argues that the identifications were unreliable (Pet. Brief, pp. 83-92) and the result of suggestive police conduct (Pet. Brief, pp. 79-83).
"[R]eliability is the linchpin in determining the admissibility of identification testimony. . . . The factors to be considered are set out in [Neil v. Biggers, 409 U.S. 188, 199-200, 93 S.Ct. 375, 34 L.Ed.2d 401
(1972)]. These include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself." Manson v. Brathwaite,432 U.S. 98, 114, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). "The standard, after all, is that of fairness as required by the Due Process Clause of the Fourteenth Amendment." Manson v. Brathwaite, supra, 432 U.S. 113. Thus, the Supreme Court set forth a balancing test after rejecting a "per se" test that would require exclusion of the identification upon a finding that it resulted from unnecessarily suggestive police procedures. See id., 108-12.[40]
"A defendant who moves to suppress identification evidence bears the initial burden of proving that the identification resulted from an unconstitutional procedure . . . In order to succeed, the defendant must prove (1) that the identification procedures were unnecessarily suggestive, and (2) that the resulting identification was not reliable in the totality of circumstances." (Citations omitted; internal quotation marks omitted.) State v. Cubano, 203 Conn. 81, 93, 523 A.2d 495 (1987); see also State v. Davis, 198 Conn. 680, 682, 504 A.2d 1372 (1986).
The court first examines Walker's claim that the identifications were subject to corrupting influences because the police "[a]sserted Walker's culpability as a known fact to a member of the community, prior to receiving any information inculpating [Walker]." (Pet. Brief, pp. 79-80.) Specifically, Walker alleges that Detective Dakin suggested to Nadine Colher that Walker killed Vess.[41] Colher did not testify at trial and no evidence was offered at the habeas hearing to show that Dakin's remark to Colher was subsequently disseminated to any member of the community. Moreover, Dakin's statement was made after Colher identified Walker in CT Page 11908 the Enfield Street case. Thus, the court does not find that Dakin's remark caused the identification procedure to be unnecessarily suggestive. Hence, Walker fails to satisfy the first prong of the test set forth in Cubano. See State v. Cubano, supra, 203 Conn. 93.
Walker also alleges that the police were impermissibly suggestive in using different pictures of him in various photographic arrays.[42]
Specifically, Walker alleges that Robinson[43], Conners and Baskerville were each shown a different picture of him in an attempt to match his picture to that witness' description of the shooter.
Although Marrero testified that it is not proper police procedure to show different photographs of a suspect to different witnesses, the court finds that the photographs at issue, Pet. Ex. 121 J and 121 G, are similar to one another. Moreover, the court does not find Walker's allegation persuasive in light of the fact that Conners described a light skin black; (Pet. Ex. 85); yet she was shown and selected a photograph, Pet. Ex. 121 G, of a dark skinned male. The court notes that Baskerville was shown a photograph, Pet. Ex. 121 J, in which Walker's skin color appears lighter. If the police showed different photographs of Walker in order to match the witness' description of the shooter with the photograph as alleged, then they would have shown Conners the lighter skinned photograph of Walker, Pet. Ex. 121 J. The court also finds that the seven other pictures included in the photographic array, Pet. Ex. 121 H (1) through (7), were quite fair in their representation of the various descriptions of the shooter. One photograph, Pet. Ex. 121 H (4), is a light skinned, Hispanic looking male that seems to match the description of the shooter that Walker repeatedly claims was accurate. Thus, the court finds that the identification procedures were not unnecessarily suggestive and, accordingly, Walker fails to meet his burden of proof under the first prong of Cubano. See State v. Cubano, supra, 203 Conn. 93.
 B. Pro secutorial Misconduct
Walker next claims that his due process rights were violated because the prosecutor: (1) failed to correct material misstatements of fact made by two of the state's witnesses, Hopkins and Marrero (Third Amended Petition, Count Four, ¶¶ 14-18); (2) failed to present all evidence that would have aided the trier of fact (Third Amended Petition, Count Four, ¶ 19); (3) presented the arrest warrant to the court that was based on "intentional, knowing, or reckless misstatements of material faqt" (Third Amended Petition, Count Four, ¶ 20); and (4) suppressed exculpatory information (Third Amended Petition, Count Four, ¶¶ 21-24.).
 1. Material Misstatements of Fact by State's Witness CT Page 11909
Walker alleges that Hopkins testified falsely at the trial when he stated that he had not located any eyewitnesses at the scene. "`A new trial is required if "the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury." Napue [v. Illinois,360 U.S. 264, 271, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959)].' Giglio v.United States, [405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); see United States v. Bagley, 473 U.S. 667, 678-80, 105 S.Ct. 3375,87 L.Ed.2d 481 (1985)." State v. Paradise, 213 Conn. 388, 400, 567 A.2d 1221
(1990).
The court notes that Hopkins' testimony that he had not located any eyewitnesses occurred some two and a half years after the shooting. Hopkins, the first police officer to arrive at the scene on the night of the shooting, wrote a report containing a description of the shooter that was provided by an alleged eyewitness, Reynolds.[44]
At trial Hopkins testified regarding his general duties to secure the crime scene and the relative location of the crime scene to various streets and businesses in the area. On cross examination Hagearty asked a series of questions that led to Hopkins' testimony that he "located no eyewitnesses." (Pet. Ex. 6, p. 33.) A reading of the trial transcript reveals that Hopkins misspoke at the trial when he testified that he had not identified any witnesses at the scene.[45] Hopkins' testimony was not challenged by Hagearty nor corrected by the prosecutor. Thus, the issue is whether Hopkins' misstatement could have reasonably affected the judgment of the jury.
Walker argues that if Hopkins had testified that he had obtained a description of the shooter from Reynolds, then Hagearty could have inquired about the course of the investigation and asked why the police arrested a man who did not fit the initial description of the shooter. (Pet. Brief, p. 97.) Walker further argues that this evidence would have been admissible under the residual exception to the hearsay rule because the hearsay contains indicia of reliability, the declarant is unavailable and the statement would otherwise be lost. (Pet. Brief, p. 97.) Alternatively, Walker argues that the statement qualifies as an excited utterance. (Pet. Brief, p. 97.)
Walker provided no foundation at trial that Reynolds' statement would qualify as an excited utterance. Walker also offered no evidence that Reynold' s statement as recorded in the police report, Pet. Ex. 10, contained any indicia of reliability. Moreover, the court finds that Reynolds' alleged description of the shooter was very similar to numerous other witnesses' trial testimony describing the shooter. Thus, Reynolds' description of the shooter was not lost because it was cumulative CT Page 11910 evidence. The court, therefore, concludes that Hopkins' false testimony could not "in any reasonable likelihood have affected the judgment of the jury." State v. Paradise, supra, 213 Conn. 400.
Walker also alleges that Marrero provided false testimony that was not corrected by the prosecution. (Pet. Brief, pp. 98-109.) Specifically, Walker claims that Marrero testified that the descriptions obtained at the scene "were inconsistent, [and] `ran the gamut', "from one end of the spectrum to the other end of the spectrum.'" (Pet. Brief, p. 98; see also Pet. Ex. 18, 28.) Walker claims that this is inconsistent with Marrero's position in his affidavit supporting the arrest warrant application that the shooter was consistently described by witnesses as "a light skinned black male wearing a dark or black 1/2 or 3/4 length jacket with red rings or bands around the shoulders." (Pet. Brief, p. 98; see also Pet. Ex. 81, ¶¶ 2, 3, 4, 6, and 8.) Further, Walker claims that the state's attorney knew of these inconsistencies because of his access, as a state's attorney, to the police reports. (Pet. Brief, p. 98.) Walker also argues that the state's attorney's failure to correct Marrero's misstatements affected the fairness of the trial by short-circuiting "inquiry into the description of the gunman." (Pet. Brief, p. 102.) Furthermore, Walker argues that if the misstatements concerning the initial descriptions had been corrected the jury would have been aware that Threet and Wallace were not alone in describing the gunman as light skinned.
Walker understates the amount of testimony that the jury heard regarding descriptions of a light skinned shooter. In spite of Marrero's alleged misstatement, the jury was aware that Threet and Wallace were not the only witnesses that described the shooter as light skinned. For instance, Gant gave extensive testimony that the shooter was light skinned. (Pet. Ex. 6, pp. 249, 251, 257.) Meade also testified at trial that she had initially given the police an incorrect description of the shooter. Moreover, Marrero's trial testimony that the shooter's descriptions fell along a broad spectrum is evidence that the jury was aware that the descriptions of the shooter were inconsistent. Thus, the court finds that Walker fails to meet his burden of establishing that Marrero's misstatements could reasonably have had any affect on the judgment of the jury. See State v. Paradise, supra, 213 Conn. 400.
 2. Duty to Present All Evidence
Walker next alleges that the state's attorney failed to present all pertinent evidence to the jury because he "did not present the evidence of the conflicting descriptions of the gunman, or of Baskerville, Meade and Conners' inconsistent statements concerning their descriptions and their opportunity to view. Further . . . he did not even correct the CT Page 11911 misstatements of his own witnesses." (Pet. Brief, p. 113.) Walker argues that he did not receive a fair trial because of the state's attorney's failures.
"[I]t is the duty of the state to ensure that all evidence tending to aid in ascertaining the truth be laid before the court, even though such evidence is not consistent with the prosecution's contention that the accused is guilty." (Citations omitted; internal quotation marks omitted.) State v. Reddick, 197 Conn. 115, 129, 496 A.2d 466 (1985), cert. denied, 474 U.S. 1067, 106 S.Ct. 822, 88 L.Ed.2d 795 (1986); see also State v. Harris, 147 Conn. 589, 597-98, 164 A.2d 399 (1960); Statev. Zimnaruk, 128 Conn. 124, 127-28, 20 A.2d 613 (1941); State v.Guilfoyle, 109 Conn. 124, 133-34, 145 A. 761 (1929). A prosecutor, however, is under no duty to present cumulative evidence or witnesses whose testimony the prosecutor believes would be unreliable. See 23A C.J.S., Criminal Law §§ 1192-93 (1989). Moreover, the prosecutor must avoid invading the province of the defense attorney in strategic decision making. See id., §§ 1192-94.
Walker's allegation that the state's attorney did not present evidence of Meade and Conners' conflicting descriptions is incorrect. On direct examination at trial, the state's attorney questioned Meade explicitly regarding her prior inconsistent description and why it was given. (Pet. Ex. 6, pp. 110-111.) During direct examination, Conners testified that on two separate occasions she picked out a photograph of a person she thought looked like the runner. (Pet. Ex. 6, pp. 46-49.) Moreover, Conners was unable to make an in-court identification of the runner.[46]
(Pet. Ex. 6, pp. 51-52.) Thus, the jury had before it ample evidence of conflicting descriptions of the shooter. Baskerville's version of the events was generally very consistent, as explained, supra, and therefore the state's attorney was not required to elicit anything further on direct examination, or in any other manner.[47] Therefore, the court finds that the state's attorney presented to the court[48] "all evidence tending to aid in asserting the truth." See State v. Reddick, supra, 197 Conn. 129.
 3. Faulty Arrest Warrant
Walker next claims that the arrest warrant used to arrest him relied upon intentional, knowing, or reckless misstatements and omissions of material facts in violation of due process. (Pet. Brief, p. 114.) Specifically, Walker alleges that the warrant misstates the accounts of Conners, Cliff Jones and Colher. (Pet. Brief, p. 115.) Walker also alleges ten omissions in the arrest warrant affidavit. (Pet. Brief, pp. 115-117.) CT Page 11912
Walker cites Franks v. Delaware, 438 U.S. 154, 155-56, 98 S.Ct. 2674,57 L.Ed.2d 667 (1978), for the proposition that when a defendant makes a substantial preliminary showing that a false statement was knowingly and intentionally, or with reckless disregard for the truth, included by the affiant in the warrant affidavit, and this allegedly false statement is necessary to the finding of probable cause, a hearing must be held at the defendant's request.
Walker first alleges that Conners did not identify Walker and therefore the arrest warrant incorrectly stated that Conners positively identified Walker as the person she saw run by her window on the night of the shooting. This allegation fails because Conners' sworn statement[49]
shows that the arrest warrant correctly summarizes one of the occasions when Conners selected a photograph of Walker. (Pet. Ex. 81, ¶ 12.)
Walker next alleges that the arrest warrant incorrectly attributed to Cliff Jones, an employee of the Blue Hills Caffi, a statement that "people at the bar were saying the suspect's name was Michael." (Pet. Brief, p. 115; Pet. Ex. 81, ¶ 10.) Jones testified at the habeas hearing that he did not make the statement attributed to him in the arrest warrant affidavit. (Transcript of Habeas Hearing, July 15, 1998 [Transcript XIII], p. 63.) Jones also testified that he had heard people saying that Michael was the shooter and that he told them that was incorrect. (Transcript XIII, p. 63.) Jones' habeas testimony shows that since other people said that Michael was the shooter, Walker was not prejudiced by the police incorrectly attributing that statement to him.
Walker also alleges that Colher never told the police that Walker's nickname was "Iceman." (Pet. Brief, p. 115.) The court finds that this allegation has no foundation because Colher's habeas testimony was not credible. At the habeas hearing Colher flatly denied or contradicted much of her testimony in the Enfield Street case although the questions asked were taken straight from the transcript of that case. (Transcript of Habeas Hearing, July 17, 1998 [Transcript XIV], Part I, pp. 9-15.) Thus, Colher's statement at the habeas hearing that she never told police that Walker' nickname is Iceman is not credible. (Transcript XIV, Part I, pp. 14-15.)
The court also finds that none of Walker's ten alleged omissions from the arrest warrant affidavit are significant. Four of the ten allegations involve omissions regarding various descriptions of the shooter given by the witnesses. These issues have been addressed elsewhere in this memorandum and no further discussion is necessary here, except to note that the alleged omissions were in no way prejudicial to Walker because all of the allegedly omitted facts were before the court. The other six allegations do not amount to a due process violation. This court has CT Page 11913 examined the transcripts and exhibits and concludes that Walker fails to meet the basic preliminary requirements for a Franks hearing. See Franksv. Delaware, supra, 438 U.S. 155-56. Walker presented no evidence of deliberate falsity or of reckless disregard for the truth as required to defeat the presumption of validity that attaches to a warrant affidavit. See State v. Dolphin, supra, 195 Conn. 458. Thus, no further inquiry into the sufficiency of the warrant is necessary. See id. Finally, because Walker was afforded a probable cause hearing, any complaint now about a deficiency in the arrest warrant affidavit is effectively moot based on the court's finding of probable cause after the hearing.
 4. Suppression of Exculpatory Evidence
Walker next claims that "the prosecutor completely failed to disclose some exculpatory material, and made untimely disclosure of other information." (Pet. Brief, p. 130.) Walker also claims that witness statements were not available to the defense before trial. (Pet. Brief, p. 137.)
"To prevail on a Brady claim, the defendant bears a heavy burden to establish:
(1) that the prosecution suppressed evidence; (2) that the evidence was favorable to the defense; and (3) that it was material. . . . The test of materiality of nondisclosed exculpatory evidence requires that there be a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. . . . [W]here there is no reasonable probability that disclosure of the exculpatory evidence would have affected the outcome, there is no constitutional violation under Brady. . . . [T]he mere possibility that an item of undisclosed evidence might have helped the defense or might have affected the outcome . . . does not establish materiality in the constitutional sense. . . ." (Citations omitted; emphasis in original; internal quotation marks omitted.) State v. Santiago,245 Conn. 301, 311, 715 A.2d 1 (1998); see also UnitedStates v. Bagley, supra, 473 U.S. 674-75.
 (a) Complete failure to disclose
Walker first alleges that certain exculpatory material was never disclosed to the defense. Specifically, Walker alleges that the prosecution completely failed to disclose "(1) information favorable to the defense but contained in the Enfield Street case; (2) information not recorded in any police report; and (3) information concerning the CT Page 11914 Chandler search warrant, which, although it related to the Meade investigation, was not included in the police file on the case, and hence was not in the prosecution file." (Pet. Brief, p. 135.)
 (1) Information from the Enfield Street case
Walker alleges that exculpatory information confirming that Walker is left handed as well as information "that one of Baskerville's descriptions of the gunman included the fact that he wore wire rimmed glasses with no lenses" was never disclosed to the defense. (Pet. Brief, pp. 135-36, n. 28.) That court finds that there was no need for the police or prosecutor to disclose information that Walker is left handed because Walker knows whether or not he is left handed. "Evidence known to the defendant or his counsel, or that is disclosed, even if during trial, is not considered suppressed as that term is used in Brady." State v.Dolphin, supra, 195 Conn. 455-56.
The court further finds that Walker provided no evidence that Hagearty did not have Baskerville's statement, Pet. Ex. 85, regarding the wire rimmed glasses.[50] The court has no reason to believe that the state's attorney did not comply with Practice Book § 40-13 that requires prosecutors to turn over witness statements to the defense. Therefore, Walker fails to meet his burden under the first prong of Brady to show that the evidence was suppressed. See State v. Santiago, supra,245 Conn. 311; United States v. Bagley, supra, 473 U.S. 674-75.
 (2) Information not recorded in any police report
Walker next points to three facts that allegedly were not included in any police report: Meade's intoxication at the time of the shooting; Conners' failure to make a photographic identification; and improper comments made to Baskerville regarding the Enfield Street case.
 (i) Meade's intoxication
Walker claims that the prosecution failed to disclose that Marrero knew that Meade was very intoxicated on the night of the shooting. (Pet. Brief, pp. 133, 135.) Marrero testified at the habeas hearing that he believed at the time of the investigation that Meade was very intoxicated on the night of the shooting. (Transcript I, pp. 107-10; Transcript of Habeas Hearing, September 29, 1998 [Transcript XX], pp. 28.)
The court finds that the prosecution suppressed information that Meade was intoxicated because that information was not recorded in any police report and was not disclosed to the defense. Therefore, the petitioner satisfies the first prong of the Brady test. See State v. Santiago, CT Page 11915 supra, 245 Conn. 311; United States v. Bagley, supra, 473 U.S. 674-75. See also General Statutes § 54-86c; Practice Book § 40-11. The court also finds that the prosecution erred in failing to disclose to the defense information that Marrero believed Meade was intoxicated on the night of the shooting because such information would have been favorable to the defense in the planning a trial strategy. Hence, the petitioner also satisfies the second prong of the Brady test. See State v.Santiago, supra, 245 Conn. 311; United States v. Bagley, supra,473 U.S. 674-75. The court, however, finds that there is no reasonable probability that there would have been a different outcome at trial if the information about Meade' s intoxication had been disclosed to the defense. See id.; State v. Milner, supra, 206 Conn. 539 n. 13. This conclusion is supported by the fact that the jury knew that Meade had been drinking on the night of the shooting. (Pet. Ex. 6, pp. 112-15.) Also, as explained in § II. B., supra, it is likely that the jury was aware that Meade had smoked an illegal substance outside of the bar on the night of the shooting. Furthermore, Meade was not the state's primary witness and her testimony merely corroborated Baskerville's certain identification of Walker as the shooter. Thus, the court concludes that the suppression of Marrero's knowledge regarding Meade's intoxication was not material under the Brady test. See Kyles v. Whitley, 514 U.S. 419,436-37, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995); United States v. Agurs,427 U.S. 97, 113-14; 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).
 (ii) Conners non-identification
Walker also alleges that Conners did not make a photographic identification of him. (Pet. Brief, 133, 136.) This allegation is factually incorrect as discussed in § IV. B., supra. Conners selected a photograph of Walker and stated that is "the man I saw running through my yard;" (Pet. Ex. 80, p. 2.); and, therefore, the court finds that noBrady material existed regarding this allegation. See State v. Santiago, supra, 245 Conn. 311.
 (iii) Comments made to Baskerville regarding the Enfield Street case
Walker further alleges that the prosecution failed to disclose "the improper comments made to Baskerville concerning the Enfield Street case." (Pet. Brief, pp. 133-34.) Walker fails to articulate what comments were made to Baskerville regarding the Enfield Street case or how he was prejudiced by the prosecution's alleged failure to disclose these comments. Walker fails to provide evidence or information to support this allegation and, accordingly, the court does not find a due process violation.
 (3) Chandler search warrant CT Page 11916
The petitioner argues the Chandler search warrant application contained information related to the investigation in the Blue Hills case, but "was not included in the police file on the case, and hence was not in the [open] prosecution file." (Pet. Brief, p. 135.) Specifically, Walker argues that the "search warrant application, when reviewed in conjunction with the arrest warrant application, revealed that Joi Robinson was an informant." (Pet. Brief, p. 136.) Walker, however, fails to explain how information regarding Robinson would have aided in the preparation of the defense or why this information would have been favorable to his defense. Robinson never testified at the probable cause hearing or at trial, and if she had, her testimony would have been very damaging to the defense. (See Pet. Ex. 79, 81, 82.) Therefore, the court finds that Walker fails to sustain his burden under the second prong of the Brady
test. See State v. Santiago, supra, 245 Conn. 311.
 (b) Untimely disclosure
Walker also alleges that the state failed to turn over exculpatory evidence before the probable cause hearing. (Pet. Brief, pp. 133, 136-37.) Specifically, Walker argues that "Meade's statements that she couldn't identify the shooter"; (Pet. Brief, p. 133); and Baskerville's inconsistent statements contained in police reports were not available for defense counsel's use at the probable cause hearing. Since the court finds that Walker received a fair trial, any failure of the state to disclose exculpatory evidence at the probable cause hearing was harmless error beyond a reasonable doubt. See State v. Ortiz, 252 Conn. 533, 547,747 A.2d 487 (2000); see also State v. McPhail, 213 Conn. 161, 171,567 A.2d 812 (1989).
 (c) Witness statements
Walker alleges that the witness statements of Conners, Meade, Allen and Baskerville were "not provided to the defense under the open file policy"; (Pet. Brief, p. 137); and, therefore, were not available before trial. Walker offers no evidence in support of this allegation and the court has no way of knowing whether these statements were in the state's file.[51] Thus, Walker fails to show that there was any suppression and therefore he fails to meet his burden of proof under the first prong ofBrady. See State v. Santiago, supra, 245 Conn. 311.
 C. Jury Instructions
Walker next claims that during the jury instructions, the trial court improperly marshaled the evidence in the state's favor. (Third Amended Petition, Count Four, ¶ 25; Pet. Brief, p. 137.) In particular, Walker CT Page 11917 alleges that the trial court misconstrued the testimony of Gant, Meade, Conners, Sims, Baskerville, Wallace and Threet, as well as the evidence about the halfway house. (Pet. Brief, pp. 16-17, 139.) Walker also alleges that the "court repeatedly emphasized the state's version of disputed evidence." (Pet. Brief, p. 139.)
"A defendant is entitled to have the jury adequately and correctly instructed . . . The trial court's jury instructions must therefore be clear, accurate, complete and comprehensible. . . . We do not, however, view instructions in artificial isolation from the overall charge. "(Citations omitted; internal quotation marks omitted.) State v. Mackor,11 Conn. App. 316, 325, 527 A.2d 710 (1987).
"In reviewing the charge as a whole, the instructions need not be perfect, as long as they are legally correct, adapted to the issues and sufficient for the jury's guidance. . . . The test to be applied to any part of a charge is whether the charge, considered in its entirety, presents the case to the jury so that no injustice will result. (Citations omitted; internal quotation marks omitted.) Id., 326.
"Fair comment on the evidence and the credibility of the witnesses is permissible. . . ." (Citation omitted.) Id. "The trial court, in its instructions to the jury, may refer to the evidence presented, in its discretion, as long as it does not misstate or unfairly summarize the evidence and thereby invade the province of the jury as the trieroffact. . . ." (Citation omitted.) Id.
Walker alleges that the trial court presented the prosecution's view of Mead's testimony when it explained that Meade initially gave a description of a different person as the shooter because of Meade's fear of the petitioner. (Pet. Brief, p. 16.) After a careful reading of the trial transcript; (Pet. Ex 6); this court finds, however, that it was fair for the trial court to link Meade's fear to the petitioner. See §§ II. B. and III., A., supra.
Walker also alleges that the trial court erred in stating that Conners and Sims identified him and "testified that the shooter ran through the lot." "(Pet. Brief, p. 16.) After a thorough reading of the court's jury instructions, the court finds that it was fair to include Conners and Sims in a list of witnesses "making identification of the shooter." (Pet. Ex. 6, p. 430.) The court further finds that it was fair for the trial court to list Conners and Sims as witnesses who "described the shooter as having then run through the empty lot from Albany Avenue to Adams Street." (Pet. Ex. 6, p. 436.) A careful reading of the trial court's jury instructions also reveals that the court fairly summarized the evidence as it was presented at trial. The court evenhandedly CT Page 11918 reviewed the testimony presented and pointed out inconsistencies in the testimony of witnesses for both sides. Moreover, the court issued disclaimers regarding any marshaling of the evidence. Before and after reviewing the evidence, the court emphasized that the jury should rely on its recollection of the facts and not the court's or the attorney's recollection. Thus, the court concludes that Walker fails to show that the jury charge as a whole did not properly serve to instruct the jury of their role as the finders of fact. See State v. Mackor, supra.11 Conn. App. 327.
 V. Actual Innocence
Finally, Walker claims in two separate counts that he is actually innocent. (Third Amended Petition, Counts 1 and 2; Pet. Brief, pp. 139-52.)[52] Specifically, Walker alleges that "[t]he contemporaneous descriptions of the gunman did not correspond to the petitioner's appearance, and there was no evidence suggesting Mr. Walker was responsible for this crime until members of the Hartford Police Department planted the seed of suspicion in the community surrounding the Blue Hills Cafe." (Pet. Brief, pp. 144.)
In order to prevail on a freestanding claim of actual innocence, the petitioner must meet the following standard of proof: "First, taking into account both the evidence produced in the original criminal trial and the evidence produced in the habeas hearing, the petitioner must persuade the habeas court by clear and convincing evidence, as that standard is properly understood and applied in the context of such a claim, that the petitioner is actually innocent of the crime of which he stands convicted. Second, the petitioner must establish that, after considering all of that evidence and the inferences drawn therefrom . . . no reasonable fact finder would find the petitioner guilty." Miller v.Commissioner, 242 Conn. 745, 791-92, 700 A.2d 1108 (1997). The court must take into account and balance the various interests at stake, specifically, the risk that an innocent person may be incarcerated despite his conviction after a fair trial versus the risk that a guilty person fairly convicted, may be set free years later. See Summerville v.Warden, 229 Conn. 397, 423, 641 A.2d 1356 (1994); see also Miller v.Commissioner, supra, 242 Conn. 792.
Walker's actual innocence claim seems to be built on the premise that his conviction was due to suggestive police work. (Pet. Brief, p. 144.) As explained in § IV. A., supra, the court finds that there was no suggestive police conduct and therefore this premise fails as a ground for an actual innocence claim. Walker also relies on assertions that CT Page 11919 Baskerville and Meade have recanted their identifications of him as the shooter. (Pet. Brief, p. 145.) This premise for actual innocence also fails because the court finds that Meade's and Baskerville's habeas testimony was generally unreliable in comparison to their testimony at trial. See §§ II. A. and B, supra.
The petitioner also points to the habeas testimony of Allen, Henry, Threet, Conners and Marrero as providing new evidence that Walker is actually innocent. (Pet. Brief, p. 145.) The testimony of these witnesses, however, does not persuaded the court by clear and convincing evidence that Walker is actually innocent of the crime of which he stands convicted. See Miller v. Commissioner, supra, 242 Conn. 79 1-92. The court does not find, in light of all the evidence from the trial and new evidence from the habeas hearing, that "no reasonable fact finder would find the petitioner guilty." Id.
Walker also seems to argue that the federal standard for actual innocence claims in habeas cases articulated by the United States Supreme Court in Murray v. Carrier, 477 U.S. 478, 496, 106 S.Ct. 2639,91 L.Ed.2d 397 (1986), and Schlup v. Delo, 513 U.S. 298, 115 S.Ct. 851,130 L.Ed.2d 808
(1995), should be adopted in Connecticut. (See Pet. Brief, pp. 139-40, 150-52.) For the reasons set forth below, the court declines Walker's invitation to adopt the federal standard.
In the federal courts, there are two types of actual innocence claims that habeas petitioners may assert, gateway and freestanding claims. SeeMurray v. Carrier, supra, 477 U.S. 478; Schlup v. Delo, supra,513 U.S. 298. Gateway claims are usually asserted supplemental to, or in conjunction with, a constitutional claim. See Miller v. Commissioner, supra, 242 Conn. 788 n. 28. Freestanding claims of actual innocence, however, are independent claims where no constitutional violation is claimed. See id. Connecticut courts only recognize freestanding claims of actual innocence. See Miller v. Commissioner, supra, 242 Conn. 745;Summerville v. Warden, supra, 229 Conn. 426. Underlying both the federal and Connecticut standards is the "fundamental miscarriage of justice" exception established in Murray v. Carrier, supra, 477 U.S. 495-96.
One might argue that Connecticut courts have implied that gateway claims are permissible in Connecticut state habeas proceedings. Based on this premise, the court would have to recognize and adopt, as part of a gateway claim of actual innocence, the "new reliable" evidence standard articulated in Schlup v. Delo, supra, 513 U.S. 324. Walker claims that because of Hagearty's deficient performance, the state's attorney's prosecutorial misconduct and the other alleged constitutional violations discussed, supra, certain evidence that existed at the time of trial was not presented to the jury. Walker claims this evidence is newly reliable CT Page 11920 because it points to his actual innocence.
Even if this court adopted the federal gateway standard articulated inSchlup and Carrier, Walker's claim of actual innocence fails because he fails to sustain his burden of proof on his claims of ineffective assistance of trial counsel and prosecutorial misconduct. Thus, there is no evidence, under any legal standard, for this court to find that Walker is actually innocent.
 VI. Conclusion For all of the foregoing reasons the petition is dismissed.
By the court,
Zarella, J.